**J.A.W., Appellant–Plaintiff,**

v.

**Loretta ROBERTS, Joseph F. Bottorff, Gordon Chastain, James Collins, Richard Francis, Fran Gummerson, Sharon Miller, Nicholas Sanders and Mark Wright, Appellees–Defendants.**

No. 30A05–9108–CV–248.

Court of Appeals of Indiana, Fifth District.

Jan. 13, 1994.

---

Stephen Laudig, Linda S. George, Laudig & George, Indianapolis, for appellant-plaintiff.

Karl L. Mulvaney, Patrick A. Elward, Douglas E. Cressler, Nana Quay–Smith, Bingham Summers Welsh & Spilman, Indianapolis, for appellee Richard Francis.

George M. Plews, Karon L. Arnold–Hatleli, Plews & Shadley, Indianapolis, for appellee Gordon Chastain.

Stephen J. Peters, William N. Ivers, Stewart & Irwin, Indianapolis, for appellee Loretta Roberts.

Herbert A. Jensen, Robert L. Trierweiler, Indianapolis, for appellee James Collins.

RUCKER, Judge.

In this summary judgment action we are called upon to determine whether a person may be held civilly liable to the victim of child sexual abuse when he or she knows of the abuse but fails to report it to the authorities.

This case involves the tragic story of now twenty-three-year old J.W. who suffered physical and sexual abuse at the hands of his foster father, Edward Bramblett. J.W. was born April 17, 1970 and after being abandoned by his birth mother, lived with his father and paternal grandmother. After his father's death in 1973, J.W. was adopted by his grandmother. In 1978, at the age of eight, J.W. was removed from the custody of his grandmother, made a ward of the court, and placed into the foster care and custody of Edward and Marguerite Bramblett, husband and wife. Within one month of taking custody of the eight-year-old J.W., Edward Bramblett began sexually molesting him. When J.W. was fourteen years old, Edward Bramblett began permitting other men to sexually molest the teenager. This sexual abuse continued until 1989, when J.W. left the Bramblett household and reported the abuse to authorities. As a result, Edward Bramblett, Waldo Hoffman and Robert Haydock pled guilty and were sentenced for sexual molestation. A fourth man charged with sexually molesting J.W. is presently awaiting trial.

In April 1990, J.W. filed two complaints seeking to recover for injuries he incurred as a result of being subjected to eleven years of child abuse. The first complaint, which is not before us today, includes among others, all of the persons who allegedly molested J.W. The second complaint, which is the subject of this appeal, lists as defendants Loretta Roberts, Joseph Bottorff, Gordon Chastain, James Collins, Richard Francis, Fran Gummerson, Sharon Miller, Nicholas Sanders and Mark Wright. These defendants are not alleged to have molested J.W., nor are they alleged to have participated in the molestations. Rather, J.W.'s complaint alleges these defendants had knowledge of the molestations, materially assisted in covering them up, and failed to report the abuse to local authorities.

■ Each defendant filed separate answers to the complaint and after extensive discovery defendants Roberts, Chastain, Col-

lins, Francis, Gummerson and Miller, filed motions for summary judgment. Defendant Bottorff filed a motion to dismiss. The trial court granted the motions for summary judgment and, after considering matters outside the pleadings, also granted Bottorff's motion to dismiss.[1] J.W. now appeals the trial court's judgment raising several issues for our review which we consolidate and rephrase as whether the trial court erred in determining the appellees owed J.W. no common law duty to report to the authorities allegations that J.W. was suffering sexual abuse at the hands of Edward Bramblett. We also address several of the appellees' requests for an award of attorneys fees under Ind. Appellate Rule 15(G).

Before discussing the issues raised in this appeal, we first address a procedural matter. While this appeal was pending J.W. entered into a Covenant Not To Sue, Indemnity Agreement and Structured Settlement with various parties including Appellees Fran Gummerson and Sharon Miller. Thereafter, J.W., Gummerson and Miller filed a stipulation of dismissal with the trial court. On motion by defendant Loretta Roberts, objecting to the stipulation of dismissal, the trial court designated Sharon Miller and Fran Gummerson as "nonparties" for the purpose of certain affirmative defenses asserted by Roberts under the Comparative Fault Act. *See* Ind.Code § 34–4–33–1 *et seq.* J.W. then filed with this court a motion to dismiss this appeal as against Gummerson and Miller. Roberts, along with the remaining appellees, filed joint motions in opposition to the proposed dismissal on the grounds that Gummerson and Miller should be designated as nonparties to this appeal for comparative fault purposes.

■ The appellees cite *Bowles v. Tatom* (1989), Ind. 546 N.E.2d 1188, in support of their position that Gummerson and Miller should not be dismissed from this appeal. In that case our supreme court addressed the issue of whether the Indiana Comparative Fault Act requires that parties dismissed at

---

1. Because matters outside the pleadings were presented to and not excluded by the trial court, Bottorff's motion to dismiss was automatically transformed into a motion for summary judg-

ment. Ind.Trial Rule 12(B)(8). On review, we therefore treat the trial court's grant of Bottorff's motion to dismiss as a grant of summary judgment in Bottorff's favor.

the close of the plaintiff's case remain non-party defendants for the purpose of final determination of fault. The court ultimately determined the dismissed parties did not fall within the statutory definition of "nonparty." However, in so doing the court observed:

> In cases where motions at the conclusion of the plaintiff's evidence threaten to remove a party that a remaining defendant claims should remain a party or nonparty for purposes of allocation of fault, such remaining defendant may and should oppose the motion or request that any ruling be delayed until the remaining defendant has had an opportunity to present his evidence. In such event, the nature and purpose of the Indiana Comparative Fault Act, together with the efficient administration of justice, would normally result in a trial court's refusal to prematurely dismiss and discharge such parties. *In the present case, defendant Bowles did not object to the dismissals* or otherwise assert any claim that the adjacent property owners, city or mayor should remain for purposes of allocation of fault. Because the statutory burden of proof is upon the defendant with respect to the nonparty defense, *failure to timely present such an objection waives the defense as to the dismissed parties.*

*Id.* at 1190 (emphasis added). Thus, while *Bowles* dictates that a failure to object at trial to the dismissal of co-defendants waives the nonparty defense as to the dismissed parties, the case does not stand for the proposition that an appellee may not be dismissed from an appeal on motion by an appellant.

▆ In this case Appellee Roberts made timely objection to the trial court concerning the dismissal of Gummerson and Miller. In response, the trial court designated Gummerson and Miller as nonparties for the purposes of the Act at least as to Roberts' claim of comparative fault.[2] Thus, the dismissal of the appeal against Gummerson and Miller in this instance has no bearing on their nonpar-

ty status in the trial court for any possible further proceedings. Therefore we grant J.W.'s motion to dismiss the appeal as against Fran Gummerson and Sharon Miller.

## I.

▆ J.W. contends the trial court erred in entering summary judgment in favor of appellees because each knew that Edward Bramblett and others were molesting him and "intentionally, negligently and grossly failed to report the sexual molestations to the authorities." *Brief of Appellant* at 6. When reviewing the grant of a summary judgment motion, our well settled standard of review is the same as it was for the trial court: whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as matter of law. *Montgomery County Farm Bureau Co-op. v. Deseret Title Holding Corp.* (1987), Ind.App., 513 N.E.2d 193, *reh'g denied.* We stand in the shoes of the trial court. All evidence must be construed in favor of the opposing party, and all doubts as to the existence of a material issue must be resolved against the moving party. Even if facts are not in dispute, summary judgment is inappropriate if conflicting inferences arise. *Ayres v. Indian Heights Volunteer Fire Dep't, Inc.* (1986), Ind., 493 N.E.2d 1229. When a motion for summary judgment is made and supported by the materials contemplated by Indiana Trial Rule 56, the opposing party may not rest on his pleadings but must set forth specific facts using supporting materials contemplated by this rule. *Id.* If the opposing party fails to meet this burden, summary judgment may be granted.

## II.

▆ We first note that of the five appellees whose summary judgments are being reviewed here, only James Collins filed his motion for summary judgment after January 1, 1991, the effective date of the amendment to Trial Rule 56.[3] Thus, we look only to

---

2. The record is not clear whether the remaining defendants joined Roberts in her motion. Thus it is not clear whether, at any trial on the merits, the nonparty defense would be available to the remaining defendants other than Roberts.

3. The 1991 amendments to Trial Rule 56 restricted the evidence which may be considered by the trial court and this court when ruling on a motion for summary judgment to that evidence "designated" to the trial court. Ind.Trial Rules 56(C) and (H). Under the new rule, neither the

materials designated under Trial Rule 56(C) upon review of the summary judgment granted in favor of James Collins. *See Rosi v. Business Furniture Corp.* (1993), Ind., 615 N.E.2d 431. As to the other appellees, namely, Loretta Roberts, Joseph Bottorff, Gordon Chastain, and Richard Francis, we apply the former, less restrictive standard of review. *See, e.g., Stephenson v. Ledbetter* (1992), Ind., 596 N.E.2d 1369 (applying the pre–1991 version of Trial Rule 56, and resulting method of review, when summary judgment being reviewed was requested and ordered before the effective date of the 1991 amendments). Therefore, the summary judgments granted in favor of Roberts, Bottorff, Chastain, and Francis will be affirmed if sustainable on any theory or basis found in the record.

Appellee James Collins filed an answer to J.W.'s complaint and generally denied the allegations contained therein. In support of his motion for summary judgment, Collins designated portions of the published deposition of J.W. which included J.W.'s answers to interrogatories. Specifically, Collins designated J.W.'s response to an interrogatory requiring J.W. to state the names of any persons he claimed had knowledge of the sexual abuse, or how and in what manner the sexual abuse occurred. J.W.'s response listed a number of people, none of whom was James Collins. Thus, Collins carried his initial burden of proof demonstrating he was entitled to summary judgment as a matter of law because he had no knowledge of J.W.'s alleged sexual abuse.

In opposition to the Collins motion, J.W. did not direct the trial court's attention to any evidentiary materials. Rather, J.W. relied upon his complaint and asserted throughout his trial memoranda as well as his brief to this court, that Collins "knew" of the sexual molestations and failed to report them. This is not sufficient. Memoranda do not fall within the class of documents to be considered by the trial court or this court in ruling on motions for summary judgment, *Vanco v. Sportsmax, Inc.* (1983), Ind.App., 448 N.E.2d 1198, *reh'g denied,* and unsworn commentary of counsel does not comply with summary judgment rules and therefore cannot be considered. *Freson v. Combs* (1982), Ind.App., 433 N.E.2d 55, *reh'g denied.* A non-movant in a motion for summary judgment may not rest upon the allegations or denials in his pleadings, but must respond with affidavits or other evidence setting forth specific facts showing that there is a genuine issue in dispute. *Tucher v. Brothers Auto Salvage Yard* (1991), Ind.App., 564 N.E.2d 560, 563, *trans. denied.* If the non-moving party fails to meet his burden, summary judgment may be entered against him. . Ind.Trial Rule 56(E).

In the case before us Appellee James Collins demonstrated to the trial court that he was entitled to summary judgment on J.W.'s complaint because he had no knowledge of the sexual abuse. J.W. rested on his pleadings and failed to set forth specific facts controverting appellee's contention. Summary judgment in favor of Collins is therefore appropriate.

## III.

We now turn to the remaining appellees and J.W.'s claim of negligence.[4] The tort of negligence is comprised of three elements: 1) a duty owed to the plaintiff, 2) a breach of that duty by the defendant, 3) which proximately caused plaintiff's damage. *Webb v. Jarvis* (1991), Ind., 575 N.E.2d 992, *reh'g denied.* Whether a duty exists is a question of law. Therefore, this court must

---

trial court nor this court may search the record and base its determination upon materials which were not designated to the trial court by the parties. *Rosi v. Business Furniture Corp.* (1993), Ind. 615 N.E.2d 431; *Babinchak v. Town of Chesterton* (1992), Ind.App., 598 N.E.2d 1099, *reh'g denied.*

4. In his complaint, J.W. raised various theories for relief including civil conspiracy. On appeal, however, J.W. challenges the trial court's order only regarding his claim of negligence based on the defendants-appellees' knowledge of the sexual abuse and their failure to report it to the authorities. When an appellant fails to raise and argue in his brief a cause of action disposed of below, he waives the right to challenge the trial court's disposition on appeal. *National By–Products, Inc. v. Ladd* (1990), Ind.App., 555 N.E.2d . 518, 520. Therefore we address only J.W.'s negligence claim.

determine whether the law recognizes any obligation on the part of Loretta Roberts, Joseph Bottorff, Gordon Chastain, and Richard Francis to conform their conduct to a standard of reasonable care on behalf of J.W. In determining whether any of the appellees owed J.W. a common law duty we must balance three competing factors: 1) the relationship between J.W. and each of the appellees, 2) the reasonable foreseeability of harm to J.W. and 3) public policy concerns. *See Webb,* 575 N.E.2d at 995.

## A. Relationship Between the Parties

■■■ Generally, one has no legal obligation to go to the aid of a victim in peril. *L.S. Ayres & Co. v. Hicks* (1942), 220 Ind. 86, 40 N.E.2d 334, *reh'g denied,* 220 Ind. 86, 41 N.E.2d 195. As one commentator observed "[t]here is no legal duty to be a Good Samaritan. Such a rule represents an attitude of rugged, perhaps heartless, individualism, and the tendency of the courts is to increasingly restrict it." 3 Fowler v. Harper, et al., *The Law of Torts* § 18.6 at 719 (2nd ed. 1986). This court has held that when a defendant's alleged negligence arises from nonfeasance, the complete omission or failure to perform, as opposed to misfeasance, negligent conduct or active misconduct, then the duty to act must arise from a special relationship between the parties. *Lather v. Berg* (1988), Ind.App., 519 N.E.2d 755, *reh'g denied.* Absent a special relationship between a plaintiff and a defendant, we will not impose a duty on the defendant to take affirmative steps to prevent harm to the plaintiff. *Ember v. B.F.D., Inc.* (1986), Ind.App., 490 N.E.2d 764, *modified and reh'g denied,* 521 N.E.2d 981, *trans. denied.*

■■■ The foregoing authority makes clear that knowledge of another's peril, even knowledge of the existence of criminal activity, standing alone, imposes no common law duty on one possessing such knowledge to take any affirmative action. As a civil society we certainly encourage third parties and bystanders to aid the helpless, the homeless, and victims of catastrophe. *See, e.g.,* Ind. Code § 34-4-12-1 (commonly referred to as the "good samaritan statute" which encourages persons to render emergency care to accident victims). However, we have declined to impose a duty to act absent the existence of a special relationship.

While our research has revealed no cases specifically defining the term "special relationship," our courts have determined that such a relationship exists under certain circumstances: innkeepers and patrons, *Welch v. Railroad Crossing, Inc.* (1986), Ind.App., 488 N.E.2d 383; landowners and invitees, *Burrell v. Meads* (1991), Ind., 569 N.E.2d 637, *reh'g denied;* supervising adults and children, *Johnson v. Pettigrew* (1992), Ind. App., 595 N.E.2d 747, *trans. denied;* teachers and students, *Miller v. Griesel* (1974), 261 Ind. 604, 308 N.E.2d 701; and nursing home and nursing home patients, *Cowe v. Forum Group, Inc.* (1991), Ind., 575 N.E.2d 630. The underlying thread binding these cases together is the level of interaction or dependency between the parties that surpasses what is common or usual. Under those circumstances the relationship is characterized as "special."

■■■ In the case of Loretta Roberts, J.W. asserts she possessed knowledge of the molestations and because she is the sister of Edward Bramblett, Roberts had a duty to report the abuse. We disagree. Knowledge of criminal activity, standing alone, is not enough to impose a common law duty on the person in possession of such knowledge. Rather, our inquiry must focus on whether there existed a level of interaction or dependency between Roberts and J.W. that surpasses what is common or usual which we may characterize as a special relationship. We must answer this inquiry in the negative.

■■■ Nothing before us shows there was any interaction between J.W. and Roberts. J.W. never lived in the same household as Roberts during the time the molestations were occurring; there is no indication that J.W. and Roberts ever communicated with one another except for occasional family gatherings; and, by J.W.'s own admission, J.W. never told Roberts of the molestation nor sought her advice and counsel on the matter. Rather, the record shows that Roberts knew of the relationship between Bramblett and J.W. because Bramblett sent a

number of letters to her explaining his involvement with J.W. Based on the materials before us we conclude there was no special relationship existing between J.W. and Loretta Roberts.

■ J.W. next contends that a special relationship existed between him, Bottorff, Chastain, and Francis because of their status as either counselors or clergy. J.W. cites no authority in support of his position that status, standing alone, creates a special relationship and our own research reveals no such authority. Rather, whether a special relationship exists is fact sensitive and dependent on the level of interaction or dependency between the parties that surpasses what is common or usual. *See Welch,* 488 N.E.2d 383 (innkeepers and patrons); *Burrell,* 569 N.E.2d 637 (landowners and invitees); *Miller,* 308 N.E.2d 701 (teachers and students); *Cowe,* 575 N.E.2d 630 (nursing homes and nursing home patients); *Johnson,* 595 N.E.2d 747 (supervising adult and child).

■ In the case of Appellee Joseph Bottorff, J.W.'s affidavits reveal that Bramblett and his wife were experiencing marital difficulty and were seeing Joseph Bottorff for marriage counseling. Sometime in 1984, when J.W. was age fourteen, Bramblett took J.W. to Bottorff's office. Bottorff indicated he was aware of the relationship between J.W. and Bramblett and asked J.W. how he felt about Bramblett having sex with him. The affidavits reveal J.W. attended the marriage counseling sessions three times over a period of two months.

While the record reveals Bottorff possessed knowledge of Bramblett sexually assaulting J.W., it does not reveal a level of interaction or dependency which can be characterized as a special relationship. For example, contrary to J.W.'s assertion, the record does not show that Appellee Bottorff "undertook counseling [J.W.] with regard to the child molestations that he was enduring." *Reply Brief of Appellant* at 16. There is no indication of the specific subject matter the counseling sessions were designed to address other than the marital problems existing between Bramblett and his wife. There is no indication of any specific advice Bottorff gave J.W. concerning the molestations, nor is there any indication that J.W. responded to any such advice. In sum, nothing in the record demonstrates that a special relationship existed between J.W. and Bottorff.

■ As for Gordon Chastain, J.W.'s affidavit in opposition to Chastain's motion for summary judgment asserts among other things that J.W. first met Chastain in 1984; that over a period of six months he talked to Chastain about a sexual relationship he was having with Bramblett; that they spoke in church on at least three occasions; and that there were a number of other conversations at parties and other church social events. Even taking the assertions in J.W.'s affidavit as uncontroverted and true, they do not establish the existence of a special relationship between him and Chastain.[5] At most, the record shows Chastain had knowledge of J.W. being assaulted by Bramblett. Again, knowledge of criminal activity, standing alone, is not enough to impose a common law duty on the person in possession of such knowledge.

---

5. We note the facts alleged in J.W.'s affidavit in response to Chastain's motion for summary judgment do in fact controvert J.W.'s deposition testimony. For example, the affidavit asserts "[w]e spoke in the church on at least three occasions. There were a number of other conversations at parties and other social events." *Record* at 22. However, in his deposition J.W. testified that all meetings with Chastain occurred in the church sanctuary just prior to church service. (Deposition of J.W., *Supp. Record* at 396–99, 402–03, 436–37, 441). J.W.'s deposition testimony never discloses he engaged in conversations with Chastain at parties and other social events concerning Bramblett. Rather, J.W. testified that he only *saw* Chastain at social events. (Deposition of J.W., *Supp. Record* at 387–88). Further, in his affidavit J.W. asserts that he informed Chastain "I was having problems with Ed always wanting to have sex with me and I did not know how to get away from him." *Record* at 22. However, in his deposition J.W. testified he told Chastain of his "sexual relationship" with Bramblett and asked whether homosexuality was right or wrong. (Deposition of J.W., *Supp. Record* at 417, 420). According to J.W., Chastain replied that homosexuality was an acceptable lifestyle and a matter of personal choice. (Deposition of J.W., *Supp. Record* at 421–24). In contrast, the deposition is silent concerning J.W. seeking advice on how to get away from Bramblett. *Record* at 22.

In support of his motion for summary judgment, Francis tendered his affidavit asserting that he did not meet J.W. until 1987, that he either privately met with or talked over the telephone to J.W. approximately a dozen times, that the discussions were confidential in nature concerning spiritual matters, and that at no time did J.W. state that he was being sexually abused by Bramblett or others. J.W. countered with his own affidavit asserting, among other things, that J.W. first met Francis in 1985 when J.W. was fourteen years of age and that between 1985 and 1989 he spoke with Francis in excess of fifty times either in his office, at his home, at the church, or over the telephone. According to J.W., he sought help from Francis concerning the sexual abuse he was suffering from Bramblett and others. J.W. contends Francis advised him that at sometime in the future J.W. could move from Bramblett's home, but in the meantime J.W. should pray to make sure his soul was saved.

■ As we have indicated, it is ordinarily within the province of the court to determine whether a special relationship exists which may give rise to a duty. However, where factual questions are interwoven with the determination of the existence of a relationship, then the existence of a duty becomes a mixed question of law and fact, ultimately to be resolved by the factfinder. *Harper v. Guarantee Auto Stores* (1989), Ind. App. 533 N.E.2d 1258, *trans. denied*. In this instance, if the allegations in J.W.'s affidavit are true, then a special relationship existed between him and Francis. Conversely, if the allegations in Francis's affidavit are true, then no such special relationship existed. The conflicting affidavits raise a genuine issue of material fact which cannot be resolved by summary disposition.

**B. Foreseeability**

■ In analyzing the foreseeability component of duty, we focus on whether the person actually harmed was a foreseeable victim and whether the type of harm actually inflicted was reasonably foreseeable. *Webb v. Jarvis* (1991), Ind. 575 N.E.2d 992, 997. J.W. contends that he was a foreseeable plaintiff injured by a foreseeable risk. Ac-

cording to J.W., the appellees knew or should have known that the sexual abuse he was suffering at the hands of Bramblett would continue absent adult intervention. Thus, concludes J.W., appellees could reasonably foresee that the failure to report the abuse to the authorities would result in harm, namely, continuing abuse.

Appellees counter that in determining foreseeability we must analyze the same factors as those used to determine proximate cause. Proximate cause has been defined as "that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the result complained of and without which the result would not have occurred." *Orville Milk Co. v. Beller* (1985), Ind.App., 486 N.E.2d 555, 559. According to appellees, the causal connection between the continued sexual abuse and the failure to report the abuse to the authorities was broken by J.W.'s own conduct.

Specifically, appellees assert and the record reveals that in 1984, Bramblett admitted to an adult, not a party to these proceedings, that he was sexually involved with J.W. The adult reported the information to the Marion County Department of Public Welfare (DPW) on July 23, 1984. Subsequently, a case worker from the DPW and a Marion County Sheriff's deputy interviewed J.W. concerning allegations of the July 23 report. J.W. denied the allegations. *Supp. Record* at 734, 735. J.W. was interviewed on several other occasions by police officers and representatives from other agencies concerning reports that J.W. was being sexually abused. During these investigations, J.W. denied all allegations of sexual abuse. *Supp. Record* at 528–29, 534.

■ According to appellees, the foregoing facts demonstrate a break in the causal chain and therefore their failure to report the abuse was not the proximate cause of any continuing abuse. We reject appellees' contention for two reasons. First, the law in this jurisdiction is well settled that the existence of proximate cause is normally a question of fact to be determined by the jury. *Adams Township v. Sturdevant* (1991), Ind. App., 570 N.E.2d 87, *trans. denied*. Only where a single inference or conclusion can be

drawn from undisputed facts is the existence of proximate cause a matter of law to be determined by the court. *Id.* Here, we cannot say as a matter of law that J.W.'s denials to the authorities that he was a victim of sexual abuse broke the causal connection between the continued sexual abuse and appellees' failure to report the abuse to the authorities.

Second, we do not agree with appellees that in determining *foreseeability* we must analyze the same factors as those used to determine proximate cause. Rather, it is where we determine the existence of a *duty* that we are concerned with the same factors as in the inquiry into the proximate cause. This is so because both inquiries "seek to find what consequences of the challenged conduct should have been foreseen by the actor who engaged in it." *Webb,* 575 N.E.2d at 997. At this stage in our analysis our focus is limited to the foreseeability component of duty. In so doing we must examine what forces and human conduct should have appeared on the scene, and we weigh the dangers likely to flow from the challenged conduct in light of these forces and conduct. *Id.*

Here, the record supports J.W.'s assertion that appellees Loretta Roberts, Joseph Bottorff, Gordon Chastain and Richard Francis were aware of Bramblett's sexual assaults on J.W. We conclude appellees should have known that failure to intervene by reporting the abuse to appropriate authorities created an unreasonable risk that the abuse would continue.

We hasten to add that reporting the abuse would not necessarily have stopped it and we do not so hold. As the record shows, a timely report to the authorities by one conscientious adult resulted in J.W.'s denial of abuse and thus the abuse apparently continued. Even the panoply of services available to an allegedly abused child does not guarantee the abuse will end. However, services available to protect the interest of the child may include immediate removal of the child from the home, Ind.Code § 31–6–7–14; appointment of a guardian ad litem to protect the child's interest, Ind.Code § 31–6–11–9; availability of family and rehabilitative services to the child and the child's family, Ind.Code § 31–6–11–11(f); and possibly criminal prosecution of the responsible party, Ind.Code § 31–6–11–11(g). Thus, a report to the local child protection agency allows these and other actions to be set in motion, which, in turn, makes continued abuse less likely.

We must also acknowledge that child abuse is more often than not committed in secret upon silent and powerless victims. It takes no leap of logic to conclude that the secretive commission of child abuse is likely to continue absent intervention by appropriate authorities to whom the abuse has been reported. According to the National Committee for Prevention of Child Abuse, a consistent rise in the incidence of child abuse has slowed in recent years; the decrease is attributable in part to increased public awareness and the reporting of suspected abuse. William Check, *The Encyclopedia of Health: Child Abuse* 14 (1989). We hold, therefore, that the foreseeability of continued abuse weighs in favor of imposing a common law duty to report alleged child abuse to the authorities.

## C. Public Policy

As our supreme court has observed, "[d]uty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Webb,* 575 N.E.2d at 997 *citing Prosser and Keeton on Torts,* § 53 (5th ed. 1984).

J.W. contends public policy should favor imposing a common law duty on adults with knowledge of child sexual abuse to report that abuse to authorities. In support of his contention J.W. argues that a major obstacle to ending child abuse is the failure of adults to report the crime. He notes that child abuse causes enormous harm manifested by mental, emotional, and physical trauma which often leaves a child with lasting and debilitating fears. *See Child Abuse and Neglect,* Ind. State Dep't of Health (1991). According to J.W., encouraging timely reporting of child abuse through the threat of civil liability would serve to protect the victims of this heinous crime.

We have no quarrel with J.W.'s observations concerning the effect that nonreporting of child abuse has on its victims. In fact, our legislature has already taken steps to encourage reporting of child abuse by making it a Class B misdemeanor for a person who has reason to believe such abuse or neglect exists to knowingly fail to report his or her belief to the local child protection service or law enforcement agency. Ind.Code § 31–6–11–20. However, like the majority of state legislatures, our legislature has declined to codify a civil cause of action against an adult who knowingly fails to report alleged child abuse. Our research reveals that only seven states have codified a civil cause of action for the failure to report child abuse. *See* Ark.Code § 12–12–503(b); Colo.Rev.Stat. § 19–3–304(4)(b); Iowa Code § 232.75; Mich.Comp. Laws § 722.633; Mont.Code § 41–3–207; N.Y.Soc.Serv.Law § 420; R.I.Gen. Laws § 40–11–6.1 (imposing civil liability for damages proximately caused by failure to report child abuse).

Absent codification, we are not convinced that extending a civil remedy to a victim of abuse or neglect against all persons who know of child abuse and fail to report child abuse is good public policy. Rather, we agree with the majority in the Third District of this court which observed:

> [A civil action based on the failure to report allegations of child sexual abuse] would, we believe, misdirect judicial time and attention from the very real problems of children in need of services in favor of pursuing collateral individuals, who are presumably capable of responding in money damages, on the ground that they knowingly failed to make an oral report.

*Borne v. Northwest Allen County School Corp.* (1989), Ind.App., 532 N.E.2d 1196, 1203, *trans. denied* (1990) Ind., 558 N.E.2d 828.

## D.  Conclusion

After balancing the relationship between the parties, the foreseeability of harm, and the public policy concerns, we conclude that Loretta Roberts, Joseph Bottorff, and Gordon Chastain did not owe J.W. a common law duty to report to the authorities allegations of sexual abuse. There is no question these three adults knew of the abuse and could have reasonably foreseen that it would likely continue absent adult intervention. However, the foreseeability of harm is outweighed by the lack of a special relationship between J.W. and each of the parties and a public policy which stands firmly against imposing a common law duty under the facts of this case. It is axiomatic that absent a duty a claim of negligence must fail. Therefore, summary judgment was properly entered in favor of Roberts, Bottorff, and Chastain on J.W.'s complaint for negligence.

However, we reach a different conclusion with respect to Richard Francis. As with the other three defendants Francis knew of the alleged abuse and could have reasonably foreseen that it would continue absent adult intervention. In addition, there is a genuine issue of material fact as to whether Francis enjoyed a special relationship with J.W. When the level of interaction or dependency between an abused child and an adult results in a special relationship, the adult necessarily assumes a greater responsibility for that child. The special relationship imbues to the child a sense of security and trust. For the child, the stakes are high. For the adult, making a good faith report to a local child protection service is neither burdensome nor risky.[6] In such circumstances, the adult is committing an even greater disservice to the child when the adult fails to make a report of the alleged abuse.

In this case, if a special relationship did indeed exist between Francis and J.W., then two of the three *Webb* factors would weigh in favor of imposing on Francis a common law duty to report the allegations of sexual abuse to the authorities. Whether a duty exists as well as whether Francis' breach of that duty proximately caused J.W. any damage are questions to be determined by the factfinder. Summary judgment in

---

6. The legislature has also provided that any person, other than one accused of abuse or neglect, who makes a report to the authorities is immune from civil liability or criminal prosecution. Ind. Code § 31–6–11–7.

favor of Richard Francis was improperly entered and therefore must be reversed.[7]

## IV.

On cross-appeal, Appellees Roberts, Collins, and Chastain request an award of attorneys fees under Ind.Appellate Rule 15(G). Rule 15(G) permits this court to assess damages in favor of the appellee and against the appellant for prosecuting an appeal which is frivolous, taken in bad faith, taken for purposes of harassment, vexation, or delay, or when issues presented are wholly without substance or merit. *Briggs v. Clinton County Bank & Trust Co.* (1983), Ind.App., 452 N.E.2d 989. Such damages are an extraordinary measure. *In re Estate of Watson* (1983), Ind.App., 449 N.E.2d 1156. Punitive sanctions may not be imposed to punish lack of merit unless an appellant's contentions and argument are utterly devoid of all plausibility. *Orr v. Turco Mfg. Co.* (1987), Ind. 512 N.E.2d 151. Because J.W.'s claims are not utterly devoid of all plausibility, we decline to award attorneys fees in this instance.

Judgment affirmed in part and reversed in part.

BARTEAU, J., concurs in result with separate opinion.

SULLIVAN, J., concurs in part and dissents in part with separate opinion.

BARTEAU, Judge, concurring in result.

I fully concur with affirming the summary judgment in favor of James Collins. However, while I agree with the results reached as to the others, I do have concerns about the applicable law.

In determining whether a duty exists in a negligence action based on misfeasance, clearly, the proper balancing test to use is found in *Webb v. Jarvis* (1991), Ind., 575 N.E.2d 992, *reh'g denied:* (1) the relationship between the plaintiff and defendant; (2) foreseeability of harm to the plaintiff; and (3) public policy concerns. However, this case concerns the *nonfeasance* of the defendants. As stated in the majority opinion:

> [W]hen a defendant's alleged negligence arises from nonfeasance, ... as opposed to misfeasance, ... then the duty to act must arise from a special relationship between the parties. *Lather v. Berg* (1988), Ind. App., 519 N.E.2d 755, *reh'g denied. Absent a special relationship between a plaintiff and a defendant, we will not impose a duty on the defendant to take affirmative steps to prevent harm to the plaintiff. Ember v. B.F.D., Inc.* (1986), Ind. App., 490 N.E.2d 764, *modified and reh'g denied,* 521 N.E.2d 981, *trans. denied.*

(At 809; my emphasis). I do not agree once it is determined a special relationship does not exist, that we must continue analyzing the other factors in the *Webb* test to determine whether a duty exists. As stated in *Lather,* where the negligence action is for nonfeasance, absent a special relationship, no duty, and therefore no liability, will attach. 519 N.E.2d 755. That ends our inquiry as to each of the defendants, except Francis. If the fact-finder determines that Francis did have a special relationship with J.W., then the remaining factors of the *Webb* test are appropriately balanced with the presence of a special relationship to determine whether a duty should be imposed.

SULLIVAN, Judge, concurring in part and dissenting in part.

I fully concur in the majority's characterization of this case as a case involving "the tragic story of now twenty-three year old J.W. who suffered physical and sexual abuse at the hands of his foster father" [and at least four other molesters]. At 806. It is clear, however, that we do not here deal with civil liability of Edward Bramblett, the foster father, or upon the part of the other molesters. We are concerned solely with allegations of civil liability against third persons,

---

7. J.W. also challenges the trial court's entry of summary judgment on the grounds that Ind.Code § 31-6-11-3(a) imposes a duty on Appellees to report allegations of abuse. Thus, J.W. reasons, violation of the statute results in negligence as a matter of law. The identical argument was made and rejected in *Borne v. Northwest Allen County School Corp.* (1989), Ind.App., 532 N.E.2d 1196. We reach the same conclusion here today and decline to address the matter any further.

some of whom had knowledge of the sexual abuse but failed to report those communications from J.W. to law enforcement authorities.

The plaintiff does not allege a civil conspiracy to perpetuate the molestation pattern perpetrated by Bramblett and his cohorts; the complaint does not allege that the various defendants here actively or by accessorial conduct participated in the molestations. The complaint alleges only that these defendants by failing to report the molestations caused compensable personal injury to J.W.

I concur in Parts I, II and IV. of the majority opinion. As to Part III, I concur in result as to Defendants Roberts, Bottorff, and Chastain, but dissent as to Defendant Francis. In doing so, I depart from the analysis of Judge Rucker and from that of Judge Barteau with regard to whether the existence of a duty is dependent upon a "special" relationship between the parties. I further disagree with their conclusion that there is or could be a material issue of fact as to proximate cause.

In her separate concurrence, Judge Barteau relies upon dictum from *Lather v. Berg* (1988) 2d Dist.Ind.App., 519 N.E.2d 755, 759. The quoted portion is dictum with regard to any perceived distinction between misfeasance and nonfeasance except, perhaps, with regard to a duty to control the conduct of a third person. *See Restatement (Second) of Torts* § 315 (1965). In *Lather,* the conduct involved was misfeasance. The case does discuss the concept that a defendant may be liable to a third person for failing to carry out a duty which was gratuitously assumed, but such a "special" duty does not focus upon whether the duty was not carried out (nonfeasance) or was carried out negligently (misfeasance). The fact remains, negligence, i.e., the failure to exercise reasonable care under the circumstances, does not depend upon whether the conduct is misfeasance or nonfeasance. In other words, negligence is negligence. Necessarily then, the analysis by which the existence of a duty is found to exist does not depend upon the distinction. *See*

*Miller v. Griesel* (1974) 261 Ind. 604, 308 N.E.2d 701.

*Webb v. Jarvis* (1991) Ind., 575 N.E.2d 992, which controls our determination as to whether a duty existed between any or all of the various defendants and J.W., also involved misfeasance by a physician, i.e., over-prescribing anabolic steroids for a patient who in turn shot a third party. The suit was by the third party against the doctor. *Webb* draws no distinction between misfeasance and nonfeasance.

In terms of the relationship between the parties and insofar as it bears upon the establishment of a duty, it suffices to say that *some* relationship must exist. To say, however, that the relationship must be "special", if the defendant's conduct is nonfeasance, is not helpful. It simply means that failure to act must be gauged *under the circumstances.* One of the circumstances to be examined is the nature and extent of ·the relationship between the parties. For this reason I discern no impediment to placing some significance, but not determinative significance, upon the existence of a special relationship, i.e., a fiduciary or other relationship of trust. Again, however, it is but one of the circumstances to be considered in applying the balancing test set forth in *Webb v. Jarvis, supra.*[1]

Making the application of the *Webb* test to defendants Roberts, Bottorff, and Chastain, the majority correctly, I believe, holds that no special relationship existed. I do not, however, agree that as to those defendants the summary judgments can be affirmed solely upon the absence of a "special" relationship. Rather, as earlier stated, the nature of the relationship is but one of several factors to be considered.

To be sure, as to defendant Francis, there are questions of fact with respect to the nature and extent of the relationship between him and J.W. Once again, however, the degree of the relationship is not the be all-end all of the inquiry. As extensively discussed

**1.** Notwithstanding strong criticism from some observers (see Jay Tidmarsh, *Tort Law: The Languages of Duty,* 25 Ind.L.Rev. 1419, 1424 *et seq.*

(1992)) the *Webb* duty test was reaffirmed in *Stump v. Commercial Union* (1992) Ind., 601 N.E.2d 327.

by the majority, the matter of foreseeability must also be examined.

In this respect, the matter of proximate cause is intertwined with concepts of duty-foreseeability although the concepts are not identical. See *Galbreath v. Engineering Construction Corp.* (1971) 149 Ind.App. 347, 273 N.E.2d 121. The majority here clearly acknowledges the subtle difference. At 811–12.

In any event, I strongly disagree with the majority's conclusion that in this case proximate cause is an open factual question. Whether the defendants might have reasonably foreseen that failure to report might result in a continuation of the abuse is not, as correctly noted by the majority, determinative of the issue. The complaint alleges only that the various defendants are liable to J.W. because, having knowledge of the molestation, they did not report that fact to law enforcement or other governmental agencies. The unmistakable implication of the majority opinion is that having met the foreseeability component of the test, liability might well result if there were a "special" relationship with J.W. as to Roberts, Bottorff, and Chastain.

Even assuming the existence of some "special" relationship, and further assuming that reporting might or might not have foreseeably led to removal of Bramblett and the four other perpetrators from society, or might have foreseeably led to complete removal of J.W. from arguably continuing and threatening circumstances, this case is not resolved.

My review of the pleadings and other materials appropriately before the trial court leads to the conclusion that as a matter of law the requisite legal nexus between the defendants' conduct and J.W.'s trauma, i.e., proximate cause, is wholly lacking. The trauma visited upon J.W. by Bramblett and the other molesters had already occasioned the irreversible damage to J.W.'s psyche. As to Francis, the only defendant determined by the majority to be subject to civil liability, the molestations began, at a minimum, six or seven years before Francis first met J.W. Furthermore, it is clear that the molestations had been reported to and investigated by the Department of Welfare and law enforcement authorities prior to March, 1985, i.e., at a time prior to or near the time when Francis first met J.W. It is inconceivable that the conduct of Francis, or the lack thereof, could contribute to the trauma experienced by J.W.

In short, the nonfeasance of each and all of the defendants is so remote to the probability of ongoing magnification of past traumatizing events as to render proximate cause absent as a matter of law.

The summary judgments should be affirmed as to all remaining defendants.