Charlotte THORNHILL and James Thornhill, Appellants–Plaintiffs,

v.

DEKA–DI RIDING STABLES, Young Men's Christian Association of Muncie, Indiana Trustees of the Muncie YMCA, and Trustees of Camp Crosley, Appellees–Defendants.

No. 85A05–9310–CV–379.

Court of Appeals of Indiana, Fifth District.

Dec. 12, 1994.

Transfer Denied March 24, 1995.

Courtney B. Justice, Delphi, for appellants.

Branch R. Lew, Fort Wayne, for appellees.

BARTEAU, Judge.

### *OPINION*

Charlotte Thornhill appeals the trial court's grant of summary judgment in favor of the YMCA, Trustees of the Muncie YMCA, and Trustees of Camp Crosley (col-

lectively "YMCA") on Thornhill's complaint for negligence. Thornhill's complaint against Deka–Di Riding Stables remains pending. This appeal presents the following three issues [1]:

1. Whether YMCA owed a duty to Thornhill;

2. If so, whether YMCA breached its duty to Thornhill; and

3. Whether Thornhill incurred the risk of injury.

Oral argument was heard on October 12, 1994. We reverse.

### FACTS

Thornhill attended the YMCA's Women's Wellness Weekend held at the YMCA Camp Crosley on May 19–21, 1989. On Saturday, May 20, Thornhill went horseback riding at Deka–Di Riding Stables with women from the Wellness Weekend. During the trail ride, Thornhill's horse bolted and Thornhill fell off the horse, sustaining injuries.

Horseback riding had been advertised as an optional activity during the Women's Wellness Weekend. Thornhill paid an additional five-dollar fee with her Weekend registration fee in order to participate in the horseback ride. The women participating in the horseback ride had to sign up for a trail ride time at Camp Crosley and had to arrange their own transportation to the Deka–Di Riding Stables, located off the Camp Crosley premises. Since approximately 1983, the YMCA had an arrangement with Deka–Di whereby Camp Crosley campers received a discount at Deka–Di Stables. Camp Crosley collected the fees and paid Deka–Di in one lump sum for the Camp Crosley riders. At the time Thornhill went on the trail ride, two YMCA staff persons also were on the trail ride. The trail ride was not a part of their duties as YMCA staff for the Women's Wellness Weekend. They were, however, free to participate in the horseback riding and had to pay the riding fee. During summer camp sessions with children, the YMCA had exercised control and supervision of the trail rides at the Deka–Di stables.

Prior to beginning the trail ride, Thornhill asked the Deka–Di staff for a gentle horse and was assured that the horse picked for her, Chantasy, was gentle. Thornhill had been horseback riding before. When she was thirteen, she lived with her sister who boarded horses. The owner of one of the horses gave Thornhill informal riding lessons, letting her ride his horse under his supervision. This lasted for about one year. Also, in 1978 Thornhill chaperoned a church youth group outing on a horseback ride at Brown County State Park. That was a closely supervised trail ride. According to Thornhill, neither the YMCA staff nor the Deka–Di staff gave the riders any instructions on safe riding prior to the Deka–Di ride. The YMCA presented evidence that the riders were instructed on safe riding by the Deka–Di staff member who acted as the trail leader. Evidence was presented that during the ride, the trail leader allowed the horses to get too far apart and galloped the horses up a muddy hill. After being galloped, Thornhill's horse, for unknown reasons, suddenly bolted. Although Thornhill pulled in the reins and yelled "Whoa," she could not regain control of the horse and fell off, sustaining injuries.

A YMCA staff member who was on the trail ride saw the accident. She did not go to Thornhill's assistance. The Deka–Di trail leader did assist Thornhill. When Thornhill told the trail leader that she had been riding Chantasy, the trail leader remarked that Chantasy was known to be temperamental. Other evidence, however, was presented that no one at Deka–Di or the YMCA was aware

---

1. Thornhill also argues that the trial court erroneously struck the affidavit of private investigator Ron Hofer. Attached to Hofer's affidavit was an unsigned, unsworn and unverified recorded statement of Kim Brooks, the Deka–Di stables trail leader. The YMCA moved for the statement to be struck because it was inadmissible hearsay and the trial court granted the motion. The trial court did not err. In *Sanders v. Townsend* (1987), Ind.App., 509 N.E.2d 860, we held that a report attached to an affidavit and prepared by someone other than the affiant was not properly considered by the trial court for purposes of summary judgment because the report did not represent facts within the personal knowledge of the affiant, as required by Ind.Trial Rule 56. Here, the statement of Kim Brooks did not present facts within the personal knowledge of Ron Hofer, the affiant, so the trial court properly struck the statement.

of any problems with Chantasy prior to Thornhill's accident.

Other facts will be presented where necessary.

## STANDARD OF REVIEW

In summary judgment proceedings, the party moving for summary judgment must show that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Once the movant establishes that no genuine issue of fact exists, the party opposing summary judgment must set forth specific facts indicating that there is a genuine issue in dispute. If the nonmoving party fails to meet this burden, summary judgment in favor of the moving party is appropriate. *Pierce v. Bank One–Franklin, NA* (1993), Ind.App., 618 N.E.2d 16, 18, *trans. denied.* Further, the party moving for summary judgment must designate to the trial court all parts of the matters included in the record that it relies on for the motion. The opposing party likewise must designate to the trial court "each material issue of fact which that party asserts precludes entry of summary judgment and the evidence relevant thereto." Ind. Trial Rule 56(C). Any doubt as to the existence of a factual issue should be resolved against the moving party, construing all properly asserted facts and reasonable inferences in favor of the nonmovant. *Cowe v. Forum Group, Inc.* (1991), Ind., 575 N.E.2d 630, 633.

## DUTY

Thornhill argues that the trial court erroneously granted summary judgment in favor of the YMCA, concluding that the YMCA did not owe a duty to Thornhill with respect to the trail ride. In determining whether a duty exists, three factors must be balanced: (1) the relationship between the parties, (2) the reasonable foreseeability of harm to the person injured, and (3) public policy concerns. *Webb v. Jarvis* (1991), Ind., 575 N.E.2d 992, 995, *reh'g denied.* Ordinarily, whether a duty exists is a question of law. *J.A.W. v. Roberts* (1994), Ind.App., 627 N.E.2d 802, 811.

Thornhill argues that the YMCA and Thornhill had a relationship that gave rise to a duty under the *Webb* analysis. Thornhill analogizes the relationship to an innkeeper/guest relationship which imposes a duty to exercise ordinary and reasonable care for the safety of the guest. In *J.A.W.,* we noted types of relationships that give rise to a duty to take affirmative steps to prevent harm to the plaintiff: innkeepers and patrons, *Welch v. Railroad Crossing, Inc.* (1986), Ind.App., 488 N.E.2d 383; landowners and invitees, *Burrell v. Meads* (1991), Ind., 569 N.E.2d 637, *reh'g denied;* supervising adults and children, *Johnson v. Pettigrew* (1992), Ind. App., 595 N.E.2d 747, *trans. denied;* teachers and students, *Miller v. Griesel* (1974), 261 Ind. 604, 308 N.E.2d 701; and nursing homes and nursing home patients, *Cowe,* 575 N.E.2d 630. *J.A.W.,* 627 N.E.2d at 809. "The underlying thread binding these cases together is the level of interaction or dependency between the parties that surpasses what is common or usual." *Id.* Also common to each of those cases is that the defendant was in control of the premises where the injury occurred. That is not the case here, but that distinction is not fatal to Thornhill's claim.

In *Vetor v. Vetor* (1994), Ind.App., 634 N.E.2d 513, the plaintiff was bitten by a dog while visiting her father at her grandfather's home. The dog belonged to the plaintiff's uncle. The complaint alleged that the injuries from the bite were proximately caused by the failure of the father and grandfather to protect the plaintiff from the dog. This court affirmed the summary judgment granted in favor of the father because at the time of the incident the father had entrusted the plaintiff's care to the grandfather, and because the father "had no relationship whatsoever with the dog which bit her. He did not own either the dog or land upon which it roamed, and there is no evidence that he played any role in the dog's keeping." *Id.* at 515. Thus, any duty the father owed his daughter did not extend to protecting her from the dog.

In contrast, here, the YMCA did have a relationship with Thornhill with respect to the trail ride because it had a relationship

with Deka–Di stables that gave it some measure of control over the trail rides with respect to Camp Crosley campers. The YMCA had a long-standing arrangement with Deka–Di to bring groups of riders from Camp Crosley to Deka–Di at a discount to the campers. The YMCA advertised horseback riding as an activity offered to Camp Crosley campers and to the Women's Wellness Weekend participants. During camp sessions for children, trail rides were arranged through Deka–Di and the YMCA staff members actively supervised the rides. Thornhill paid the trail ride fee directly to the YMCA along with her registration fee for the Women's Wellness Weekend. The YMCA then paid Deka–Di for the trail rides by Camp Crosley campers. The YMCA organized the trail ride by reserving ride times with Deka–Di and then having the campers sign up for a ride time at Camp Crosley. YMCA supervisors actively participated in the trail ride and, even if the trial ride was not a part of their duties, Thornhill relied on the supervisors to keep the trail ride safe as she had relied on them to keep all the camp activities safe. Additionally, the YMCA acknowledged its involvement in the trail ride when it filled out an "Irregularity Report" and an "Accident Report Form" for its files. The YMCA forms indicated that Thornhill was participating in an activity at the time of the incident and that a staff person was present.

In essence, the YMCA was selling the Women's Wellness Weekend as a package deal that included horseback riding arranged by the YMCA through Deka–Di stables and the YMCA had a relationship to Deka–Di that gave the YMCA some measure of control over the manner in which the trail ride was conducted. Under these facts and circumstances, the YMCA had a relationship to Thornhill with respect to the trail ride that supports the imposition of a duty.

As to foreseeability of the injury, clearly it was foreseeable that a person could be thrown from a horse and injured, and the YMCA does not argue otherwise. The YMCA does argue that the public policy component of the duty issue weighs against imposition of a duty because to impose a duty would be "tantamount to making [the YMCA] a babysitter of a 45 year-old adult." Brief of Appellees, p. 36. We would agree with this characterization if the evidence did not lead to the conclusion that the YMCA's actions led Thornhill to believe that the YMCA was providing a safe trail ride, as it provided other safe activities for the Women's Wellness Weekend. However, public policy favors imposing a duty on the YMCA here because the YMCA attracted participants to its Women's Wellness Weekend by offering horseback riding as part of the weekend and by its direct involvement with the organization of the trail ride.

The trial court erred in granting summary judgment in favor of the YMCA. Under the facts presented here, the YMCA did owe a duty to Thornhill to provide a safe horseback trail ride. Still at issue, however, is whether the YMCA breached its duty.

### BREACH OF DUTY

Thornhill argues that the YMCA breached its duty of care by failing to:

1. Warn of the dangers regarding horses;
2. Provide safety equipment;
3. Supervise the trail ride, or intervene if the ride became dangerous; and
4. Come to the aid of Thornhill after she fell.

The YMCA argues that even if it did owe a duty to Thornhill, that duty was not breached because the YMCA did not have prior knowledge of the dangerousness of the horse Thornhill was riding.

Horses are domestic animals and the owner of a domestic animal is not liable for injuries caused by the animal unless the animal had dangerous propensities known, or which should have been known, to the owner. *Forrest v. Gilley* (1991), Ind.App., 570 N.E.2d 934, 935, *trans. denied.* The owner, however, is bound to know the natural propensities of the particular class of animals to which it belongs. *Id.* In *Forrest,* a novice rider fell off a horse owned by defendant and was injured. We instructed the trial court to enter summary judgment in favor of the defendant because the plaintiff did not show that the defendant breached the duty of care. There was no evidence that the horse had

any dangerous propensities or that the defendant knew of any dangerous propensities of that horse.

■ Here, there is evidence that the Deka–Di trail leader remarked that Chantasy, the horse Thornhill was riding, was "temperamental." There is also evidence that she was a gentle horse and had never been a danger to a rider. Thornhill has not presented any evidence that any YMCA staff knew the horse was "temperamental" or had any dangerous propensities. However, with respect to the YMCA, Thornhill does not argue that the YMCA breached a duty by sitting Thornhill on a dangerous horse. Thus, it is irrelevant that the YMCA did not have prior knowledge that Chantasy was dangerous.

Thornhill instead argues that the duty was breached because the ride itself was conducted in an unsafe manner and the YMCA did not intervene to protect its campers. There is evidence that the trail leader was inexperienced and galloped the horses up a muddy hill, causing the horses to become excited. There is also evidence that once galloped, horses like to run, thus suggesting a possible reason for Thornhill's horse to bolt. Additionally, there is evidence that the YMCA staff members present did nothing to keep the horses at the proper distance or to keep them at a safe pace. There is also evidence that the ride was conducted in a safe manner and that the horses were not galloped up a muddy hill. Under the evidence presented, whether the YMCA breached its duty to Thornhill to provide a safe ride is a question of fact for the jury to decide.

### INCURRED RISK

■ The YMCA maintains that Thornhill incurred the risk because she was familiar with horses and knew that horses could throw riders. Incurred risk requires a mental state of venturousness on the part of the plaintiff and entails a subjective analysis of the plaintiff's voluntary acceptance of a known risk. *Forrest*, 570 N.E.2d at 936. In *Forrest*, incurred risk was found as a matter of law because the plaintiff fell from the horse twice, the first time getting the wind knocked out of her and the second fall resulting in the injuries giving rise to the lawsuit. After the first fall, she understood and appreciated that she could fall and be injured. It is not necessary to show that the plaintiff "had prescience that the particular accident and injury which in fact occurred was going to occur." *Id.* (quoting *Hamilton v. Roger Sherman Architects Group, Inc.* (1991), Ind. App., 565 N.E.2d 1136, 1138 n. 3).

■ Thornhill knew riders could fall from a horse and be injured and knew that horses could run off and throw the rider. This is precisely what happened here. Thornhill cites to *O'Connell v. Walt Disney World Co.* (1982), Fla.App., 413 So.2d 444, to support her argument that she did not incur the risk. In *O'Connell*, a rider was injured when horses stampeded during a trail ride. The cause of the stampede was a disputed issue. There was evidence that one of the trail guides was "rein breaking" a horse, which upset the other horses. The court held that summary judgment was not appropriate because the defendant did not demonstrate the plaintiff understood and agreed to assume the risk of defendant's negligence in conducting the ride.

Here, Thornhill argues that she did not understand and agree to assume the risk that the trail leader would gallop the horses up a muddy hill, causing the horse to bolt. As in *O'Connell*, it is disputed here whether the trail ride itself was conducted in a negligent manner by galloping the horses up a muddy trail. Thus, summary judgment is inappropriate on the issue whether Thornhill incurred the risk of a negligently conducted ride.

We hold as a matter of law that the YMCA owed a duty to Thornhill to provide a safe trail ride. Whether that duty was breached is a question of fact for a jury to decide. Likewise, whether Thornhill incurred the risk of injury presents a question of fact for the jury. The trial court's grant of summary judgment in favor of the YMCA is REVERSED.

RUCKER, J., concurs.

FRIEDLANDER, J., dissents with opinion.

FRIEDLANDER, Judge, dissents.

I respectfully dissent to the majority's determination that "the YMCA had a relationship to Thornhill with respect to the trail ride that supports the imposition of a duty." Maj. at 987.

The nature of the relationship between the parties at the time of the incident is the principal focus of whether YMCA owed a duty to Thornhill. As our supreme court determined in *Greathouse v. Armstrong* (1993), Ind.App., 616 N.E.2d 364, 368, "the duty to exercise care for the safety of another arises *as a matter of law* out of some relationship existing between the parties...." The circumstances presented here demonstrate there was no special relationship, either at common law or by contract between the YMCA and Thornhill which would impose a legal duty upon the YMCA for the benefit of Thornhill.

The evidence shows that the YMCA did not retain or exercise control regarding the means and methods Deka–Di used in regards to the Wellness Weekend horseback riding activity. In *Daugherty v. Fuller Engineering* (1993), Ind.App., 615 N.E.2d 476, this court observed that the factors relevant to the issue of control include: 1. right to discharge; 2. mode of payment; 3. supplying tools or equipment; 4. a belief by the parties that a master-servant relationship exists; 5. control over the means used or the result reached; 6. the length of employment; and 7. establishing work boundaries.

The record before us shows that the YMCA lacked any authority to discharge Deka–Di or its employees. While the YMCA collected Deka–Di's fee from the campers, it paid those amounts directly to the stables without charging fees and it did not withhold taxes. Affidavits submitted to the trial court demonstrated that the YMCA did not exercise or have any involvement in the operation and activities of Deka–Di. It did not own, furnish, or have any control over the horses, stables, facilities, riding trails, or equipment used by Deka–Di.

Thornhill offers no evidence indicating that the YMCA had a right to control the manner in which Deka–Di conducted the trail ride. It is my belief that there is nothing to support a finding that the YMCA's duty of reasonable care that it may have owed Thornhill included a duty insuring her safety at the off-camp activity. I would affirm the trial court's entry of summary judgment in favor of the YMCA.