Lynne **STOCKBERGER, Personal Representative of Maurice Stockberger, Deceased, and Lynne Stockberger, Individually, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. TH 00–247–C–M/H.**

United States District Court,
S.D. Indiana,
Terre Haute Division.

Sept. 11, 2002.

Stephen L. Williams, Mann Law Firm, Terre Haute, IN, for Plaintiff.

Jeffrey L. Hunter, United States Attorney's Office, Indianapolis, IN, for Defendant.

## ORDER ON DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

McKINNEY, Chief Judge.

This matter is before the Court on defendant's, United States, Motion to Dismiss, or in the alternative, Motion for Summary Judgment on plaintiff's, Lynne Stockberger ("Stockberger"), claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671, *et seq.* The parties have fully briefed their arguments, and the motion is now ripe for ruling.

### I. FACTUAL BACKGROUND

The facts in the light most favorable to Stockberger follow. Maurice Stockberger ("Mr.Stockberger") was a federal employee on March 24, 1999, working at the United States Penitentiary Bureau of Prisons ("BOP") at Terre Haute, Indiana. Def's Stmt. of Facts ¶ 1, 3. Mr. Stockberger was an insulin dependent diabetic. Pl.'s Stmt. of Facts ¶ 25. On March 24, 1999, Mr. Stockberger arrived for his scheduled shift at the BOP, but left early because he was not feeling well. *Id.* ¶ 71. After leaving the prison, Mr. Stockberger drove erratically, running off, and back onto, State Road 63, and then ran off the road and into a tree. *Id.* ¶ 86. Mr. Stockberger died as a result of the crash.

## A. EVENTS AT BOP ON MARCH 24, 1999

Prior to leaving work on March 24, 1999, Mr. Stockberger had a number of interactions with co-workers. Alexander Jastillano ("Jastillano"), a physician's assistant at the BOP, observed Mr. Stockberger eating his lunch that day. Jastillano Dep. at 27, 37. Jastillano and Mr. Stockberger then had a conversation, during which Mr. Stockberger said, "I haven't done anything yet with our physicals and I don't feel good. I should have listened to my wife and not to go to work but I took off." *Id.* at 27. While Mr. Stockberger was eating his lunch, Jastillano offered Mr. Stockberger Ensure, which he accepted and drank. *Id.* at 29, 37. About twenty to thirty minutes after eating his lunch and drinking the Ensure, Mr. Stockberger told Jastillano that he felt, "a lot better." *Id.* at 29. Jastillano knew that Mr. Stockberger was going to drive himself home, and did not attempt to take his keys, or offer him a ride home. *Id.* at 32–33. Jastillano did not think that the situation constituted a medical emergency because Mr. Stockberger had "bounced back a little bit" after eating lunch and drinking the Ensure. *Id.* at 39.

That same day, Mr. Stockberger asked Christopher McCoy ("McCoy") to relieve him because he was ill. Pl.'s Stmt. of Facts ¶ 73. Because Mr. Stockberger was repeating himself, McCoy thought he might be having a problem with his blood sugar. *Id.* ¶ 74. McCoy suggested to Mr. Stockberger that maybe his sugar was low, and he should eat. *Id.* ¶ 75. According to McCoy, Mr. Stockberger seemed anxious to leave. *Id.* ¶ 76. However, McCoy did not think there was anything "seriously wrong" with Mr. Stockberger's condition when he left, and McCoy was not concerned about him driving home. McCoy Dep. at 40, 18.

Angela Mosley ("Mosley"), another co-worker, saw McCoy and Jastillano trying to get Mr. Stockberger to eat on the morning of March 24, 1999. Pl.'s Stmt. of Facts ¶ 78. Mosley thought that McCoy and Jastillano were concerned and wanted Mr. Stockberger to eat and wait a while. *Id.* ¶ 80. According to Mosley, on the morning of Mr. Stockberger's death, he was aggravated and angry, and adamant about going home. *Id.* ¶ 81. Mosley asked Mr. Stockberger to stay a while, and he told her to "shut up." *Id.* ¶ 82.

Officer Gehrke ("Gehrke") saw Mr. Stockberger when he was checking out. Gehrke Dep. at 10. Gehrke observed Mr. Stockberger place his keys on a small hook with a latch without problems. *Id.* at 16–18. Gehrke had a brief conversation with Mr. Stockberger just before Mr. Stockberger left the BOP, during which Gehrke asked Mr. Stockberger if he was "okay." *Id.* at 11. Mr. Stockberger responded, "Yes," but then said, "No, I don't feel well. I'm going home." *Id.* According to Gehrke, Mr. Stockberger should have turned in his radio when he left on March 24, 1999, but he did not. *Id.* at 11–12.

Mr. Stockberger also told co-workers Michael Campbell, Andrew Janosek, John Smith, and Maryellen Christeson that he wasn't feeling well and might go home. Pl.'s Stmt. of Facts ¶¶ 56, 59, 61, 62.

## B. MR. STOCKBERGER'S PRIOR HYPOGLYCEMIC EPISODES

Many of the people who worked with Mr. Stockberger at BOP had medically related jobs, or had medical backgrounds. Pl.'s Stmt. of Facts ¶ 29. Thus, they were often able to recognize Mr. Stockberger's hypoglycemic symptoms. *Id.* ¶ 33. Jastillano, for example, was aware that Mr. Stockberger was insulin dependent, and had observed Mr. Stockberger several times when he was hypoglycemic. Jastillano Dep. at 20–21. Mr. Stockber-

ger became pale, immobile, and nonresponsive when hypoglycemic. *Id.* at 21. John Smith, another co-worker, commented that Mr. Stockberger's personality would change when his blood sugar was low, and he would become quieter. Smith Dep. at 24. Dianna Kutch, who worked at the BOP as a Health Information Technician at the relevant time, remembered an incident where Mr. Stockberger was not feeling well, and at first refused to eat anything, then "got kind of violent," but subsequently backed off, ate something, and felt better. Kutch Dep. at 22–23.

### C. BOP POLICIES

The BOP had a written policy concerning assistance to be provided to BOP employees in connection with disbursement of prescription drugs. Def.'s Stmt. of Facts ¶ 6. Included in the policy is a provision stating, "[a]ll employees shall be afforded first-aid treatment for job-related injuries." Id. ¶ 7. There were no other written policies relating to providing medical care for BOP employees, or for providing transportation for employees who experience medical emergencies, illness, or injury. *Id.* ¶ 9. Employees who wished to leave due to illness were to contact their immediate supervisor. Balinao Dep. at 10.

On occasion in the past, sick or injured BOP employees were given rides home or to medical treatment facilities away from the prison by prison employees. Pl.'s Stmt. of Facts ¶ 48. Andrew Rupska ("Rupska") was an employee at the BOP who knew Mr. Stockberger and recalled instances when Mr. Stockberger wanted to go home because of his hypoglycemic condition, but Rupska did not remember ever personally driving Mr. Stockberger home. Rupska Dep. at 17. On past occasions, Rupska recalled calling Mr. Stockberger's wife to let her know he was coming home, and then Mr. Stockberger would usually call to let Rupska know he arrived safely.

*Id.* However, there was no written policy providing for transportation of employees who were experiencing medical emergencies, illness, or injuries. Def.'s Stmt. of Facts ¶ 9.

Richard G. Balinao ("Balinao"), the Assistant Health Services Administrator at the BOP, was Mr. Stockberger's supervisor on March 24, 1999. Def.'s Stmt. of Facts ¶¶ 2–3. Balinao had administrative supervisory authority over physician assistants and nurses employed in the health services unit at the BOP. *Id.* ¶ 4. Prior to Mr. Stockberger leaving on March 24, 1999, Balinao was not contacted by anyone regarding a need for Mr. Stockberger to take sick leave, and had no knowledge regarding Mr. Stockberger's condition that day. Balinao Dec. at 13–14. Under the Master Agreement between the BOP and the Council of Prison Locals, an employee absent from a shift must notify his supervisor except in an emergency situation. *Id.* at 11. The medical staff under Balinao were not authorized to compel or require any staff member to accept any medical care or advice. *Id.* at 15. No staff member under Balinao's authority was authorized to physically restrain a staff member who wished to leave the institution on sick leave. *Id.* at 16.

### II. *STANDARDS*

### A. MOTION TO DISMISS STANDARD

When ruling on a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Court accepts as true all well-pleaded factual allegations in the complaint and the inferences reasonably drawn from them. *See Baxter by Baxter v. Vigo County Sch. Corp.*, 26 F.3d 728, 730 (7th Cir.1994). Dismissal is appropriate only if it appears beyond doubt that Stockberger can prove no set of facts consistent with the allegations in the complaint that would entitle her to relief. *See Hi–Lite Prods.*

*Co. v. Am. Home Prods. Corp.,* 11 F.3d 1402, 1405 (7th Cir.1993). This standard means that if any set of facts, even hypothesized facts, could be proven consistent with the complaint, then the complaint must not be dismissed. *See Sanjuan v. Am. Bd. of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir.1994), *cert. denied,* 516 U.S. 1159, 116 S.Ct. 1044, 134 L.Ed.2d 191 (1996). Stockberger may receive the benefit of hypotheses consistent with the complaint. *See id.* (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Further, Stockberger is "not required to plead the particulars of [her] claim[s]," *Hammes v. AAMCO Transmissions, Inc.,* 33 F.3d 774 (7th Cir.1994), except in cases alleging fraud or mistake where Stockberger must plead the circumstances constituting such fraud or mistake with particularity. *See* Fed.R.Civ.P. 9(b); *Hammes,* 33 F.3d at 778. "Particularity" requires plaintiffs to plead the who, what, when, where, and how of the alleged fraud. *See Ackerman v. Northwestern Mut. Life Ins. Co.,* 172 F.3d 467, 469 (7th Cir.1999); *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990).

Finally, the Court need not ignore facts set out in the complaint that undermine Stockberger's claims, *see Homeyer v. Stanley Tulchin Assoc.,* 91 F.3d 959, 961 (7th Cir.1996) (citing *American Nurses' Ass'n v. Ill.,* 783 F.2d 716, 724 (7th cir. 1986)), nor is the Court required to accept Stockberger's legal conclusions. *See Reed v. City of Chicago,* 77 F.3d 1049, 1051 (7th Cir.1996); *Gray v. Dane County,* 854 F.2d 179, 182 (7th Cir.1988).

## B. SUMMARY JUDGMENT STANDARD

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *See also United Ass'n of Black Landscapers v. City of Milwaukee,* 916 F.2d 1261, 1267–68 (7th Cir.1990), *cert. denied,* 499 U.S. 923, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991). Motions for summary judgment are governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Oliver v. Oshkosh Truck Corp.,* 96 F.3d 992, 997 (7th Cir.1996), *cert. denied,* 520 U.S. 1116, 117 S.Ct. 1246, 137 L.Ed.2d 328 (1997). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which she relies. *See Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d

560, 562 (7th Cir.1996). When the moving party has met the standard of Rule 56, summary judgment is mandatory. *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir.1996), *cert. denied*, 519 U.S. 1109, 117 S.Ct. 945, 136 L.Ed.2d 834 (1997). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir.1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir.1992). "If the nonmoving party fails to establish the existence of an element essential to [her] case, one on which [she] would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir.1996), *cert. denied*, 519 U.S. 1115, 117 S.Ct. 957, 136 L.Ed.2d 843 (1997).

On certain occasions, the Seventh Circuit has suggested that a court approach a motion for summary judgment in an employment discrimination case with a particular degree of caution. *See, e.g., Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir.1993); *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir.1989). The language implied that summary judgment might be less appropriate in this context based upon the presence of issues of motive and intent. *See Holland*, 883 F.2d at 1312. As the Seventh Circuit emphasized, however, these cases do not establish a heightened summary judgment standard for employment-related cases. Instead, the language from the prior cases simply means "that courts should be careful in a discrimination case as in any case not to grant summary judgment if there is an issue of material fact that is genuinely contestable, which an issue of intent often though not always will be." *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir.1997). Even when discriminatory intent is at issue, summary judgment is appropriate when the nonmovant presents no evidence to indicate motive or intent in support of her position. *See Holland*, 883 F.2d at 1312. Further, the nonmovant will not defeat summary judgment merely by pointing to self-serving allegations without evidentiary support. *See Cliff v. Board of School Comm'rs*, 42 F.3d 403, 408 (7th Cir.1994).

### III. DISCUSSION

Stockberger's action is a tort claim against the United States under the Federal Tort Claims Act.[1] Stockberger claims

---

1. The source of the United States' liability, in this case, is found in the waiver of sovereign immunity as expressed in the Federal Tort Claims Act: "The United States shall be liable, respecting the provisions of this title [28 U.S.C. § 2674] relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." Because Stockberger alleges that Mr. Stockberger received negligent treatment in Indiana, the law of Indiana applies. 28 U.S.C. § 1346(b). ("the district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on or after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within

that the United States was negligent in one or more of the following ways:

(a) fail[ing] to provide proper and adequate medical care for [Mr. Stockberger's] then existing medical condition;

(b) fail[ing] to provide proper and adequate transportation for [Mr. Stockberger] during [his] then existing medical emergency;

(c) allow[ing] [Mr. Stockberger] to leave the penitentiary and drive a motor vehicle while incapable of operating a motor vehicle due to [his] then existing medical condition;

(d) allow[ing] [Mr. Stockberger] to leave the penitentiary and drive a motor vehicle unsupervised and without assistance, while incapable of operating a motor vehicle due to [his] then existing medical condition;

(e) fail[ing] to enact and/or enforce procedures for assistance of employees needing medical assistance; and

(f) fail[ing] to enact and/or enforce procedures for transportation of employees in medical emergencies.

Comp. ¶ 6. The United States filed a Motion to Dismiss for lack of subject matter jurisdiction on Stockberger's claims that the United States failed to enact and/or enforce procedures for the assistance of employees needing medical assistance, and failed to enact and/or enforce procedures for transportation of employees in medical emergencies,[2] and a Motion to Dismiss, or in the alternative, Motion for Summary Judgment on the remaining negligence claims.

## A. THE DISCRETIONARY FUNCTION EXCEPTION

The United States asserts that Stockberger's claims that it was negligent in failing to enact and/or enforce procedures for assisting employees needing medical assistance, and failing to enact and/or enforce procedures for transportation of employees in medical emergencies should be dismissed because they are barred by the discretionary function exception to the FTCA's waiver of sovereign immunity. Stockberger responds that the discretionary function exception is not applicable because the relevant statutes in this case address duties regarding inmates, but are silent on duties regarding BOP employees.

The FTCA is a "broad waiver of sovereign immunity." *Berkovitz v. United States*, 486 U.S. 531, 535, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). However, there are a number of exceptions to this waiver whereby the United States retains immunity from suit. One such exception is the discretionary function exception:

 The provisions of this chapter and section 1346(b) of this title shall not apply to:

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

---

the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred"). *See also Carter v. United States*, 785 F.Supp. 797, 799 (N.D.Ind.1992) ("Under the Federal Tort Claims Act, ... the court must apply the law of the state in which the tort is alleged to have been committed."), *aff'd*, 982 F.2d 1141 (7th Cir.1992).

**2.** See Comp. ¶ 6(e)-(f).

28 U.S.C. § 2680(a). If the conduct at issue is covered by the discretionary function exception, the claims must be dismissed for lack of subject matter jurisdiction. *See Calderon v. United States*, 123 F.3d 947, 950 (7th Cir.1997). This exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. Varig Airlines*, 467 U.S. 797, 808, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). The purpose of the discretionary function was Congress' desire to "prevent judicial 'second-guessing' of legislative and administrative decisions ground in social, economic, and political policy through the medium of an action in tort." *Id.* at 814, 104 S.Ct. 2755.

■ Whether the discretionary function exception bars suit against the United States in a given case depends on two factors. First, a discretionary act must be involved. In other words, the act or omission for which liability is sought to be imposed must involve "an element of judgment or choice." *United States v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). *See also Rothrock v. United States*, 62 F.3d 196, 198 (7th Cir. 1995). Therefore, if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," the discretionary function exception does not apply. *Gaubert*, 499 U.S. at 322, 111 S.Ct. 1267. Second, "even assuming the challenged conduct involves an element of judgment, it remains to be decided whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.*

■ First, it must be determined whether the act or omission in this case was an act of discretion involving an element of judgment. *See id.* Under 18 U.S.C. § 4042, the BOP is charged with the duty of providing "suitable quarters" and "for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" and with the duty of providing "for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042. Stockberger argues that the first *Gaubert* prong is not met because 18 U.S.C. § 4042 and the BOP's mission statement [3] only deal with policies regarding inmates, and do not discuss policies regarding employees. Essentially, Stockberger is contending that the care and incarceration of prisoners and the BOP's policies regarding their employees are separate matters, so whatever discretion 18 U.S.C. § 4042 grants the BOP in establishing policies regarding the inmates is inapplicable to setting the policies for personnel. Stockberger then cites to depositions showing examples of when the Terre Haute BOP treated or sent employees to a hospital in the past.

Stockberger's arguments miss the point. Under 18 U.S.C. § 4042, Congress charged the BOP with its central duty of controlling and safeguarding violators of federal crimes. In order to effectively carry out this charge, the BOP necessarily has substantial discretion in hiring employees, and establishing employment policies to ensure the efficient functioning of the federal prison system. Rather than being separate matters, the employees and the conditions of their employment are closely linked to the care and incarceration

**3.** The Mission Statement of the BOP from its website states: "It is the mission of the Federal Bureau of Prisons to protect society by confining offenders in the controlled environ-ments of prisons and community-based facilities that are safe, humane, cost-effective, and appropriately secure ..."

of the inmates. The BOP does, in fact, have a Health Services Manual, but the only policy remotely applicable to Stockberger's claim is Section 27, entitled "Employee Health Care." See Pl.'s Ex. 16. In Section 27, there is a provision about dispensing medication to BOP employees, and also another provision that reads, "All employees shall be afforded first-aid treatment for job-related injuries." *Id.* Neither of those policies directly applies to the current claims. In other words, no statute or regulation gives the Bureau of Prisons a precise directive on enacting provisions for medical care and transport of sick employees, nor has the BOP established any such policies consistent with its duty of safekeeping convicted prisoners. *Cf. Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954 (finding that the discretionary function exception does not apply when federal law or policy specifically proscribes a course of action for an employee to follow). Without any statute or regulation requiring the BOP to enact procedures for the assistance of employees needing medical assistance, or for the transportation of employees in cases of medical emergencies, the decision on whether or not to enact such policies required the exercise of judgment and discretion. Thus, the circumstances in this case satisfy the first of the two elements in *Gaubert.* See *Maas v. United States,* 94 F.3d 291, 297 (7th Cir. 1996) (concluding that without statute or regulations requiring the military to undertake a warning program to alert veterans of new cancer statistics, the decision to warn the veterans required the exercise of judgment and discretion); *Kiehn v. United States,* 984 F.2d 1100, 1103 (10th Cir.1993) ("[w]ithout evidence in the record that Dinosaur National Monument followed some policy or statutory directive on warning signs, there is nothing to indicate that the decision not to place warning near the petroglyphs was anything but discretionary.")

Moreover, this exercise of discretion involves policy considerations. The things Stockberger wants done—enacting and enforcing procedures and policies for medical care and transportation of sick employees—are susceptible to policy analysis. Some policy considerations might be: the type and extent of medical care to be provided to employees; who would pay for the medical care; and how to allocate limited resources so that a medical care system for employees would not take away resources from the BOP's mission of protecting society by confining offenders in a controlled environment. With regard to the BOP's purported failure to enact policies to transport employees who are ill, the following policy considerations might be considered: whether or not current BOP vehicles would be sufficient to meet the need; how to finance the purchase of new vehicles if necessary; and who would drive the vehicles. In either case, enacting a program would involve a balancing of safety and economic concerns, and this is the type of decision protected by 28 U.S.C. § 2680(a). See *Maas,* 94 F.3d at 297 ("[d]eciding whether health risks justify the cost of a notification program, and balancing the cost and the effectiveness of a type of warning, are discretionary acts covered by § 2680(a)."); see also *Cassens v. St. Louis River Cruise Lines,* 44 F.3d 508, 511 (7th Cir.1995) (deciding that decisions requiring balancing of safety and economics fall into discretionary function exception).

Stockberger argues that *Maas* is distinguishable from the instant case because the warning procedure in *Maas* would have been for numerous veterans, while this case only deals with óne employee's injury. However, if the BOP enacted a policy to care for employees who are ill and transport them in the case of emergency, it would apply to all employees, not just one as Stockberger seems to contend. Stockberger also seeks support from cases

drawing a distinction between the exercise of governmental discretion, and the exercise of professional or occupational discretion. *See Mayer v. United States,* 774 F.Supp. 1114, 1118–19 (N.D.Ill.1991) (concluding that patient release was a medical decision rather than policy-based); *Collazo v. United States,* 850 F.2d 1, 3 (1st Cir. 1988) (holding claim not barred by discretionary function when VA hospital released veteran and refused to readmit him because nothing in the record suggested that hospital's decisions were made on anything other than medical grounds). However, this line of case law is also distinguishable from the present case. Nothing in the record suggests that the BOP's failure to enact procedures to assist ill employees and provide for their transportation was medically-based rather than policy-driven. Both *Mayer* and *Collazo* involved decisions based on a physician's professional judgment, and the Court fails to see how those cases are applicable to the instant case.

Although there is no evidence in the record that the BOP explicitly considered enacting a medical care policy or transportation policy, that is of no practical consequence because "the inquiry hinges instead on whether some plausible policy justification could have undergirded the challenged conduct." *Shansky v. United States,* 164 F.3d 688, 692 (1st Cir.1999). *See also Gotha v. United States,* 115 F.3d 176, 180 (3rd Cir.1997) ("The test is not whether the government actually considered each possible alternative in the universe of options, but whether the conduct was of the type associated with the exercise of official discretion."); *Kiehn v. United States,* 984 F.2d 1100, 1105 (10th Cir.1993) (holding that "it is unnecessary for government employees to make an actual 'conscious decision' regarding policy factors" for it is

"irrelevant whether the alleged failure . . . was a matter of 'deliberate choice,' or a mere oversight") (citations omitted); *Richardson v. United States,* 943 F.2d 1107, 1111 (9th Cir.1991) (holding that the "discretionary function exception may apply 'in the absence of a conscious decision'.") (citation omitted).

> The Supreme Court stated in *Gaubert:* When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of kind conduct that can be said to be grounded in the policy of the regulatory regime.

*Gaubert,* 499 U.S. at 324–25, 111 S.Ct. 1267. This analysis routinely takes place incident to a motion to dismiss because it directly implicates subject matter jurisdiction. *See, e.g., Rothrock,* 62 F.3d at 198. "The relevant inquiry is merely whether the conduct at issue is susceptible to policy analysis." *Maas,* 94 F.3d at 298 (quoting *Gaubert,* 499 U.S. at 325, 111 S.Ct. 1267). As explained above, the enactment and enforcement of procedures for the assistance and transportation of employees needing medical aid involve discretionary policy matters implicating economic and efficiency concerns. Thus, the Court **GRANTS** defendant's Motion to Dismiss on Stockberger's failure to enact and/or enforce claims under the FTCA.

## B. INDIANA NEGLIGENCE LAW

The balance of Stockberger's claims sound in negligence.[4] To recover on a

---

4. Defendant filed a Motion to Dismiss, or in the alternative, a Motion for Summary Judgment on the remaining claims. Because the

Court has considered matters outside of the pleadings, it will treat the motion as one for summary judgment. *See Travel All Over the*

negligence theory in Indiana, Stockberger must establish three elements: "(1) a duty on the part of the [United States] to conform [its] conduct to a standard of care arising from [its] relationship with the plaintiff, (2) a failure of the [United States] to conform [its] conduct to the requisite standard of care required by the relationship, and (3) an injury to the plaintiff proximately caused by the breach." *Webb v. Jarvis,* 575 N.E.2d 992, 995 (Ind.1991).

### 1. *Duty*

Stockberger argues that the BOP owed Mr. Stockberger a duty under the following theories: (1) an employer has a duty to aid an employee who becomes ill on the job; (2) assumption of duty; and (3) a duty was created by the Rehabilitation Act of 1973. The United States responds that there is no duty under Indiana law for it to provide medical care, provide transportation for ill employees, or to keep Mr. Stockberger from driving home. Moreover, the United States contends that there was no assumption of duty, and even if there was, it was a limited undertaking. Finally, the United States argues that Stockberger's Rehabilitation Act duty claim is not supported by any authority.

### a. Duty of Employer to Aid Employee Who Becomes Ill at Work

 Whether a duty exists is a question of law. *See Webb,* 575 N.E.2d at 995. Therefore, the Court must determine whether the law recognizes any obligation on the part of the BOP to Mr. Stockberger. The *Webb* court concluded that three factors must be balanced to in order for a court to determine if a common law duty is imposed: (1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured; and (3) public policy concerns. *See Webb,* 575 N.E.2d at 995. "In its conclusion, *Webb*

emphasized that its application of the balancing test was necessarily case specific." *Cram v. Howell* 680 N.E.2d 1096, 1097 (Ind.1997).

Stockberger claims that on March 24, 1999, the BOP had a duty to: (1) provide adequate medical assistance to Mr. Stockberger; (2) prevent Mr. Stockberger from leaving due to his illness; and (3) provide transportation for him on that day. The Court will address each alleged duty.

 1. *Relationship Between the Parties*—In Indiana, one generally has no legal obligation to go to the aid of a victim in peril. *See L.S. Ayres & Co. v. Hicks,* 220 Ind. 86, 40 N.E.2d 334 (1942). "As one commentator observed '[t]here is no legal duty to be a Good Samaritan. Such a rule represents an attitude of rugged, perhaps heartless, individualism, and the tendency of the courts is to increasingly restrict it.'" *J.A.W. v. Roberts,* 627 N.E.2d 802, 809 (Ind.Ct.App.1994) (quoting 3 FOWLER & HARPER, THE LAW OF TORTS § 18.6 at 719 (2nd ed.1986)). The Indiana Supreme Court "has held that when a defendant's alleged negligence arises from nonfeasance, the complete omission or failure to perform, as opposed to misfeasance, negligent conduct or active misconduct, then the duty to act must arise from a special relationship between the parties." *J.A.W.,* 627 N.E.2d at 809 (citing *Lather v. Berg,* 519 N.E.2d 755 (1988)). Absent a special relationship, no duty will be imposed on the defendant to take affirmative steps to prevent harm to the plaintiff. *See id.*

No Indiana case law specifically defines the term "special relationship." But Indiana courts have found such a relationship in the following circumstances:

*World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423, 1429 (7th Cir.1996) (stating that "[i]f the district court considers matters outside the pleadings in connection with a motion to dismiss, it must treat the motion as one for summary judgment").

innkeepers and patrons; landowners and invitees; supervising adults and children; teachers and students; and nursing home and nursing home patients. The underlying thread binding these cases together is the level of interaction or dependency between the parties that surpasses what is common or usual. Under those circumstances the relationship is characterized as 'special.'

*J.A.W.* 627 N.E.2d at 809 (citations omitted). Stockberger relies on this quote to conclude that the employer/employee relationship is also a special relationship under Indiana law that required the BOP to take affirmative steps to assist Mr. Stockberger on March 24, 1999. *See* Pl.'s Resp. at 38–39. However, an employer/employee relationship is not referred to in that quote, or in that case. *See J.A.W.* 627 N.E.2d at 809. Stockberger also cites a Seventh Circuit Federal Employee Liability Act case that does not apply Indiana law; Indiana law controls in this FTCA case.

To determine whether a "special relationship" existed such that the BOP was under an affirmative duty to provide adequate medical care for Mr. Stockberger, the Court must focus on whether the level of "interaction or dependency" between Mr. Stockberger and the BOP surpasses what is common and usual such that the relationship may be characterized as special. *See J.A.W.,* 627 N.E.2d at 809–10. On one level, there are obviously significant interactions between an employee and an employer. However, an adult employee like Mr. Stockberger certainly is not dependent on his employer in the same way a nursing home resident is on a nursing home, or a child is on his parent or teacher. Moreover, on March 24, 1999, Mr. Stockberger sought out and found a replacement in order to leave his shift early that day, so he was off duty when he left the BOP and when the accident happened.

Stockberger contends that *Tippecanoe Loan and Trust Co. v. Cleveland Cincinnati Chicago and St. Louis Railway Co.,* 57 Ind.App. 644, 104 N.E. 866 (1914) and *L.S. Ayres & Co. v. Hicks,* 220 Ind. 86, 40 N.E.2d 334 (1942) support her contention that Indiana has recognized an employer's duty to an employee who becomes sick on the job. Both cases represent exceptions to the general "no duty to rescue" rule. In *Tippecanoe,* the plaintiff was severely cut, rendered unconscious while working on the railway, and the court held that the defendant owed plaintiff a duty to remove the plaintiff and call for surgical aid. *See Tippecanoe,* 104 N.E. at 868. In *L.S. Ayres,* the court found the defendant liable for aggravation of injuries when it failed to extricate the plaintiff, a six-year-old-boy, whose fingers were caught in the moving parts of an escalator. *See L.S. Ayres,* 40 N.E.2d at 336. The *L.S. Ayres* court commented:

> There may be principles of social conduct so universally recognized as to be demanded that they be observed as a legal duty, and the relationship of the parties may impose obligations that would not otherwise exist. Thus, it has been said that, under some circumstances, moral and humanitarian considerations may require one to render assistance to another who has been injured, even though the injury was not due to negligence on his part and may have been caused by the negligence of the injured person. Failure to render assistance in such a situation may constitute actionable negligence if the injury is aggravated through lack of due care.

*Id.* at 337. Moreover, the court also observed, "there may be a legal obligation to take positive or affirmative steps to effect the rescue of a person who is helpless and in a situation of peril, when the one proceeded against is a master or an invitor or

when the injury resulted from use of an instrumentality under the control of the defendant." *Id.*

The instant case is clearly distinguishable from *Tippecanoe* and *L.S. Ayres* and their progeny. Most importantly, on March 24, 1999, the record evidences that Mr. Stockberger was coherent, appropriate, and responsible, far from the level of incapacity [5] or helplessness of the plaintiffs in *Tippecanoe* and *L.S. Ayres*. The *Tippecanoe* plaintiff was severely cut, rendered unconscious by the loss of blood, and obviously unable to help himself. The *L.S. Ayres* plaintiff was a six-year-old boy with his hand caught in a moving escalator with the defendant's operator nearby. In contrast, Mr. Stockberger, though ill, had a number of conversations with co-workers, had his lunch and drank Ensure to increase his blood sugar level, found a replacement for his shift, and walked out of the BOP under his own power. The *L.S. Ayres* court was persuaded by universal "moral and humanitarian" considerations that required the defendant to aid the young plaintiff. *See L.S. Ayres,* 40 N.E.2d at 336. Here, however, the BOP employees gave Mr. Stockberger as much aid as he would accept. Then, Mr. Stockberger decided, as he had on prior occasions when he was ill, to drive himself home. These are not the extraordinary circumstances of a depraved failure to render assistance that gives rise to an affirmative duty to act. Moreover, while the plaintiffs in *Tippecanoe* and *L.S. Ayres* were injured by instrumentalities within the control of the defendants, Mr. Stockberger had a diabet-

ic condition; thus, his accident was not due to an instrumentality within the control of the United States. In sum, the relationship between Mr. Stockberger and the BOP weighs against imposing a common law duty to render medical assistance to Mr. Stockberger.

In addition to asserting that the BOP had a duty to provide proper and adequate medical care for Mr. Stockberger on March 24, 1999, Stockberger also argues that the BOP had a duty to provide transportation for him on that date, and a duty to prevent him from leaving under the circumstances. Stockberger cites no authority in support of her position that a special relationship exists between the employer and an employee such that an employer must provide transportation for an ill employee and physically stop him from driving home. Nor does the Court's own research reveal such authority. Thus, Stockberger has not raised an issue of material fact as to whether the BOP and Stockberger had a "special relationship" such that the BOP owed him a duty to prevent him from leaving work on March 24, 1999, or provide transportation to him that day because he was ill.

In sum, the relationship between the BOP and Mr. Stockberger weighs against imposing a common law duty to render medical assistance to Mr. Stockberger, or to prevent him from leaving and provide transportation for him.

■■■■ 2. *Foreseeability*—"In analyzing the foreseeability component of duty, [a court should] focus on whether the

---

5. For these same reasons, the present case is also distinguishable from *Iglesias v. Wells,* 441 N.E.2d 1017 (Ind.Ct.App.1982) and *Overall v. Indiana,* 525 N.E.2d 1275 (Ind.Ct.App. 1988). Both involved a highly incapacitated person being released from custody in severe winter conditions. *See id.* The plaintiff in *Iglesias,* who did not speak or understand English, was released from jail at midnight with no warm clothes, no money, and no local residence. *See Iglesias,* 441 N.E.2d at 1018. The plaintiff in *Overall* was a psychiatric patient released from a hospital in December without transportation or suitable clothing who was seen staggering eighteen miles from the hospital. *See Overall,* 525 N.E.2d at 1276.

person actually harmed was a foreseeable victim and whether the type of harm actually inflicted was reasonably foreseeable." *Webb*, 575 N.E.2d at 997. Though there has been some confusion in the Indiana courts about how to differentiate the foreseeability factor discussion from the proximate cause analysis to avoid rendering proximate cause superfluous, some of the same considerations are relevant. *See Goldsberry v. Grubbs*, 672 N.E.2d 475, 478–79 (Ind.Ct.App.1996). "This is so because both inquiries 'seek to find what consequences of the challenged conduct should have been foreseen by the actor who engaged in it.'" *J.A.W.*, 627 N.E.2d at 812 (quoting *Webb*, 575 N.E.2d at 997).

Stockberger argues that anyone with medical training would know the risks posed by an insulin dependent diabetic[6] driving, and that many employees at the BOP knew of Mr. Stockberger's diabetic condition. Further, Stockberger argues that Defendant knew Mr. Stockberger was hypoglycemic on March 24, 1999, and thus it was foreseeable that Defendant's omissions would lead to the car accident. Defendant responds that the accident and injury were in no way foreseeable because of the numerous appropriate interactions that Mr. Stockberger had with co-workers before leaving the BOP on March 24, 1999.

On March 24, 1999, the alleged omissions at the BOP were a failure to provide medical assistance, a failure to prevent Mr. Stockberger from leaving, and a failure to provide him with transportation that day. Stockberger alleges that Defendant failed to perform these duties, and should have known that the accident would result. However, even if it may be foreseeable that a diabetic in an acute hypoglycemic state could get into a car accident while driving, it was not at all clear to the BOP employees that Mr. Stockberger was in such a state on March 24, 1999. McCoy did not think there was anything "seriously wrong" with Mr. Stockberger when he left. McCoy Dep. at 40. Jastillano, who may have had the most contact with Mr. Stockberger on that day, made sure that Mr. Stockberger ate his lunch and drank his Ensure, and Mr. Stockberger subsequently told him that he felt "a lot better." Jastillano Dep. at 29. Jastillano thought Mr. Stockberger had "bounced back a little bit." *Id.* at 39. Mr. Stockberger also had a normal conversation with Officer Gehrke immediately before leaving the BOP. *See* Gehrke Dep. at 11.

Although the BOP employees knew he was ill, Mr. Stockberger never fainted, collapsed, or requested assistance on March

---

**6.** In Plaintiff's Reply to Defendant's Statement of Material Facts, Stockberger cites to depositions of BOP employees, many with medical backgrounds, as authority for a number of statements about hypoglycemia and the effects of hypoglycemia on a person with diabetes. *See, e.g.* Pl.'s Stmt. of Facts at 28, 41, 42, 43, 44, 46. This information, some of which may be relevant to the foreseeability factor, is not based on the perception of the deponent, but rather on "scientific, technical, or other specialized knowledge" within the scope of Rule 702 of the Federal Rules of Evidence. *See* FED.R.EVID. 702. However, plaintiff has failed to disclose any expert witnesses or provide any expert reports as required by FED.R.CIV.P. 26(a)(2), nor is it apparent that these witnesses could be qualified

as experts. Lay witness testimony may not be based on scientific knowledge within the scope of Rule 702. *See* FED.R.EVID. 701 ("By channeling testimony that is actually expert testimony to Rule 702, the amendment also *ensures that a party will not evade the expert* witness disclosure requirements set forth in Fed.R.Civ.P. 26 and Fed.R.Crim.P. 16 by simply calling in expert witness in the guise of a layperson." *Id.*, Advisory Committee Notes to 2000 Amendments). Thus, the portions of the testimony based on scientific knowledge *would be inadmissible at trial*, and consequently will not be considered for this motion because the Court may only consider "facts as would be admissible in evidence." FED. R.CIV.P. 56(e).

24, 1999. He did not appear to need immediate medical or surgical assistance, and he departed the BOP under his own power. In light of the numerous appropriate conversations and apparent stability of Mr. Stockberger's condition upon his departure, this Court concludes that it was not reasonably foreseeable to the BOP that Mr. Stockberger would get into an accident on March 24, 1999, and this factor weighs against the imposition of a common law duty.

■ 3. *Public Policy*—The Indiana Supreme Court has observed, "[d]uty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Webb,* 575 N.E.2d at 997 (citing PROSSER AND KEETON ON TORTS, § 53 (5th ed.1984)). The United States argues that public policy concerns strongly militate against a determination that the duties postulated by Stockberger exist. Among other things, the United States argues that a finding that employers have an affirmative duty to provide medical care would place Indiana employers in an impossible situation, forcing them to be an insurer of their employees welfare on the drive home, and putting them in the position of having to force medical care on unwilling employees. Stockberger responds that public policy favors the imposition of a duty in this case, and cites *L.S. Ayres, Tippecanoe, Overall,* and *Iglesias* as support.

As the Court previously concluded, those Indiana cases are clearly distinguishable from the present facts. Those cases prove that in some extraordinary circumstances, essentially when a defendant fails to assist a severely injured employee or invitee and allows his injuries to be exacerbated, or discharges an incapacitated patient in terrible conditions, Indiana courts may impose a common law duty to take affirmative steps to aid the victim. The

present circumstances, though tragic, do not parallel the situations in those cases.

In *Gariup Construction Co., Inc. v. Foster,* 519 N.E.2d 1224 (Ind.1988), the Indiana Supreme Court commented on the difficulty of making a duty determination in a negligence action:

> Various factors undoubtedly have been given conscious or unconscious weight, including convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, the moral blame attached to the wrongdoer, and many others. Changing social conditions lead constantly to the recognition of new duties. No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists.

*Id.* at 1227. In the present case, "reasonable persons would recognize" that there is no duty to stop an employee from driving home when the employee feels ill but responded appropriately during a number of conversations and appears to have "bounced back a little bit." Jastillano Dep. at 39. Reasonable people also would recognize that there is no duty of an employer to provide transportation home for sick employees, or to provide medical aid to an employee who did not appear to have anything "seriously wrong" with him. McCoy Dep. at 40.

A number of public policy considerations weigh against finding an affirmative duty to render medical aid, or a duty to provide transportation for ill employees, or a duty to prevent ill employees from leaving in this instance. As the United States argued, employers would have to hire medical personnel to monitor their employees' medical conditions, and this would take away from the limited allocation of resources used to keep the BOP functioning effectively. An employer charged with a

duty to prevent ill employees from leaving could be liable in tort for battery or false imprisonment. These considerations, coupled with the dearth of case law supporting Stockberger's position and lack of legislative action in the matter, persuade the Court that public policy militates against imposing a common law duty in this situation.

After balancing the relationship between the parties, the foreseeability of the harm, and the public policy concerns, the Court concludes that the BOP did not owe Mr. Stockberger a common law duty to prevent him from leaving the BOP on March 24, 1999, to provide transportation for him, or to provide medical assistance.

### b. Assumption of Duty

■ Stockberger also contends that the BOP assumed a duty to provide medical assistance and transportation for ill employees, essentially because BOP employees had transported Mr. Stockberger and otherwise accommodated his diabetic condition in the past. The United States responds that employees were not authorized by the BOP to provide medical care to employees, and, to the extent that BOP employees did so in the past, medical aid was never given against the ill employee's wishes.

"Indiana recognizes that a duty may be imposed upon one who by affirmative conduct or agreement assumes to act, even gratuitously, for another to exercise care and skill in what he has undertaken. However, in such a case, precisely what has been undertaken must be determined because liability is no broader than the actual duty assumed." *Board of Comm'rs of Monroe County v. Hatton,* 427 N.E.2d 696, 699–700 (Ind.Ct.App.1981) (citations omitted).

In the instant case, if any duty was undertaken by the BOP, the extent of what was undertaken must be determined. There were no applicable written BOP pol-

icies. The only written policy remotely applicable dealt with giving first-aid for job-related injuries, and because Mr. Stockberger's injury was not job-related, the first-aid policy did not apply. The past medical accommodations made by the BOP consisted of giving Mr. Stockberger Ensure or encouraging him to eat something when he was feeling ill. On some occasions, injured BOP employees were given rides home or to medical treatment facilities away from the prison by prison employees. *See* Pl.'s Stmt. of Facts at 48. There is some question as to whether or not Mr. Stockberger was ever driven home during past hypoglycemic episodes. *See* Rupska Dep. at 17.

Stockberger argues that these past instances of aid and transportation amount to the assumption of a duty to aid employees who are ill, and presumably also stop them from leaving even if the ill employee decides he is able to depart under his own power. However, what Stockberger contends to be BOP policy appears to be closer to concern, encouragement, and aid from friends and co-workers of Mr. Stockberger's at the BOP. No record evidence shows that Mr. Stockberger was ever forced to eat, or required to wait for a ride rather than driving himself home in the past, nor was there any applicable written policy. Even if Mr. Stockberger was given a ride on past occasions, there were other occasions when he left work ill, drove himself home, and called Rupska at work to let him know he arrived home safely. *See* Rupska Dep. at 17. Thus, the accommodations BOP undertook in the past were limited and did not amount to an assumption of duty in the present case.

Stockberger also cites to Seventh Circuit language noting, "if you do begin to rescue someone, you must complete the rescue in a non-negligent fashion even though you had no duty of rescue in the

first place." *Jackson v. City of Joliet,* 715 F.2d 1200, 1202 (7th Cir.1983). The instant case is clearly distinguishable from the circumstances the Seventh Circuit was referring to in *Jackson.* In *Jackson,* the Seventh Circuit explained that the rationale for the "non-negligent rescue" rule was "other potential rescuers (if any) will be less likely to assist if they see that someone is already at the scene giving aid." *Jackson,* 715 F.2d at 1203. In the present case, no rescue was undertaken, so there was no assumption of duty, and no potential rescuers were deterred. Offering Ensure or expressing concern for an ill co-worker in no way constitutes undertaking a rescue attempt. If a BOP employee, knowing Mr. Stockberger was seriously ill, had in fact started to take Mr. Stockberger home or to the hospital on March 24, 1999, and then dropped him off half-way, or negligently left him in the car while stopping for coffee, then a case like *Jackson* might be applicable. But here, Mr. Stockberger rejected help offered to him by co-workers, acted appropriately in a number of conversations before he departed, and left the building under his own power. Therefore, Stockberger has not raised an issue of material fact as to whether the BOP assumed a duty on March 24, 1999.

### c. Duty Created by the Rehabilitation Act of 1973

Stockberger also claims that a duty was created by Rehabilitation Act of 1973 to make some reasonable accommodation for Mr. Stockberger's diabetic condition. She has cited no authority for the assertion that a tort claim can be based on an alleged violation of the Rehabilitation Act of 1973, nor did Stockberger claim a Rehabilitation Act violation in her complaint. Thus, Stockberger has not created a genuine issue of material fact as to whether a duty was created by the Rehabilitation Act of 1973.

### 2. *Summary*

In sum, the Court's analysis of the three factors that must be balanced in order to impose a common law duty leads to the conclusion that the United States did not owe Mr. Stockberger any of the duties claimed in the complaint. Further, the United States, by any past actions or action on March 24, 1999, did not assume a duty to stop or otherwise assist Mr. Stockberger. Finally, a duty was not created by the Rehabilitation Act of 1973. Thus, Stockberger has failed to raised a material issue of fact on the duty prong of negligence under Indiana law. It is axiomatic that if no duty is owed, there can be no negligence. Thus, the Court **GRANTS** defendant's Motion for Summary Judgment on the remaining negligence claims.

### IV. *CONCLUSION*

For the reasons discussed herein, the Court finds that the plaintiff has failed to demonstrate that a genuine issue of material fact exists in this case. The Court **GRANTS** defendant's Motion to Dismiss on plaintiff's claim that defendant failed to enact and/or enforce procedures for the assistance of employees needing medical assistance. The Court **GRANTS** defendant's Motion to Dismiss on plaintiff's claim that defendant failed to enact and/or enforce procedures for transportation of employees in medical emergencies. Finally, the Court **GRANTS** defendant's Motion for Summary Judgment on the remaining negligence claims.